# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DEBORAH SKAGGS, individually, and :   Civil No. 1:19-CV-02032
on behalf of all others similarly situated, :
                                :
                Plaintiff,          :
                                :
                v.                :
                                :
GABRIEL BROTHERS, INC.,       :
                                :
              Defendant.       :   Judge Jennifer P. Wilson

## MEMORANDUM

Before the court is Plaintiff's motion for conditional certification of a collective under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. (Doc. 24.)  This action was brought on behalf of a putative collective comprised of all current and former assistant managers, including merchandise managers and customer support/experience managers (collectively, "AMs"), employed by Defendant Gabriel Brothers, Inc. ("Gabe's") from November 26, 2016 to the present.  Plaintiff, Deborah Skaggs ("Skaggs"), is a former AM who alleges that she was misclassified as exempt from the overtime provisions of the FLSA since she largely performed the work of hourly employees, rather than the work listed in Gabe's AM job descriptions.  Two elements of Skaggs' case are fatal to the collective's success: (1) disparities exist among the putative collective members, including their locations of employment, their responsibilities at these locations, and their stores' general managers ("GMs"); and (2) individualized inquiries would

be required as to the applicability of FLSA overtime exemptions which would overwhelm and frustrate collective resolution.  Because the court finds that Skaggs has not shown that she is similarly situated to the opt-in Plaintiffs for purposes of collective administration under the FLSA, the court will deny the motion for conditional certification.  (Doc. 24.)

## PROCEDURAL HISTORY

Skaggs commenced this civil action on November 26, 2019, alleging FLSA violations for unpaid overtime wages and that she was misclassified as exempt under the FLSA's overtime provisions.  (Doc. 1, ¶¶ 5, 49–52.)  Skaggs seeks to bring this lawsuit as a collective action on behalf of all AMs who are or were employed by Gabe's any time on or after November 26, 2016.  (Doc. 24, p. 1.)[1]

On March 11, 2020, the parties participated in a case management call with the court, during which their proposed case management plan was reviewed and adopted.  (Docs. 13, 14, 15.)  As part of their joint case management plan, the parties agreed that limited discovery would occur in connection with Skaggs' motion for conditional certification.  (Doc. 15.)  Based on the record before the court, it appears that this limited discovery included significant document production, depositions of Skaggs and two opt-in Plaintiffs, the exchange of initial disclosures and interrogatories, a Rule 30(b)(6) deposition, and the exchange of

---

[1] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

declarations from additional opt-in Plaintiffs and seven AMs employed by Gabe's across various locations and states.

On August 10, 2020, Skaggs filed a motion for conditional certification, attaching various discovery documents in support thereof.  (Docs. 24, 25, 29, 33, 55.)  Gabe's filed a brief in opposition, also including a voluminous discovery record in support thereof.  (Doc. 43.)  Skaggs timely filed a reply brief.  (Doc. 45.)  With court approval, Gabe's filed a sur-reply brief.  (Docs. 49, 50.)  The parties have also filed notices of supplemental authority on November 2, 2020, November 23, 2020, and January 13, 2021, accompanied by responses from the opposing party.  (Docs. 56, 60, 61, 62, 65, 66.)  Thus, the motion for conditional certification is now ripe for review.

### Factual Background

Gabe's is a retail chain offering reduced prices on brand name merchandise that operates 110 retail locations across 13 states, including Delaware, Georgia, Indiana, Kentucky, Maryland, New Jersey, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia.  (Doc. 1, ¶¶ 2, 17, 27–28; Doc. 43, p. 9.)  At each of its retail locations, Gabe's is run by one general manager ("GM"); one or more AMs, which could include a combination of one or more merchandise managers and/or customer experience/support managers depending on the store's sales volume; various intermediate supervisors; and

3

associate-level employees tasked with the bulk of the manual labor in each store. (Doc. 25-2, pp. 7–9; Doc. 29-1, pp. 5–12.)

Based on Gabe's job descriptions, AMs are responsible for, *inter alia*, leading a team and supporting the general manager; ensuring that team members understand how to place products; participating in store walk throughs with the GM "to identify strengths and opportunities;" assigning and delegating responsibilities for tasks and decisions; setting clear objectives and measures for team members; monitoring team members' process, progress, and results; providing feedback on team members' work; communicating hiring needs to the GM; hiring, training, and leading retention of new hires; assessing "training and growth opportunities in departments and creat[ing] a development plan for team" members; conducting performance reviews; addressing "poor performance or policy violations . . . including coaching and counseling up to termination."[2] (Doc. 25-6, p. 2; Doc. 25-7, p. 2.) In addition, AMs should have a "proven ability to effectively delegate, follow up, and communicate with all levels of the organization." (Doc. 25-6, p. 3; Doc. 25-7, p. 3.) Gabe's also sets physical requirements for its merchandise managers, including the ability to stand for long periods of time and lift up to 50 pounds. (Doc. 25-6, p. 3.)

---

[2] The court notes that there is slight variation in responsibilities between merchandise managers and customer support/experience managers. However, the court has listed duties that correspond to both positions.

Skaggs is a former merchandise manager who was employed by Gabe's in York, Pennsylvania. (Doc. 1, ¶ 10.) Skaggs alleges that she did not perform the duties enumerated in the merchandise manager job description that pertained to managerial work. (*Id.* ¶¶ 12, 32, 34–37.) Rather, Skaggs claims that the vast majority of her duties as an AM involved the job description's physical requirements, which coincided with the responsibilities of hourly employees. (*Id.* ¶¶ 12, 35, 37.) Skaggs alleges that she consistently worked over 40 hours per week, but did not receive additional compensation for this time since she was classified as exempt from the overtime provisions of the FLSA. (*Id.* ¶¶ 6, 11, 31.) Thus, Skaggs asserts that Gabe's misclassified her, and all other AMs, as exempt under the FLSA. (*Id.* ¶ 6.)

Because the court finds that there are differences between Skaggs' and the opt-in Plaintiffs' self-described job duties, the court includes a brief discussion of each Plaintiff below.

### A. Named Plaintiff Deborah Skaggs

Skaggs worked as a merchandise manager from August 24, 2014 through March 27, 2017 in Gabe's York, Pennsylvania store.[3] (Doc. 25-3, p. 5.) Skaggs asserts that she consistently worked 50 to 60 hours per week, but admitted that she

---

[3] Skaggs claims that she also intermittently worked at Gabe's Bel Air, Maryland store. (Doc. 25-3, p. 13.)

did not have any records to corroborate these hours since Gabe's did not require her to keep track of her time.  (*Id.* at 44, 54–56.)  During her time as an AM, Skaggs testified that between 80 to 90 percent of her working hours were spent cleaning the store, assisting customers, unloading freight, helping customers at the cash registers, and generally working alongside the hourly associate employees.[4] (*Id.* at 8, 25–26, 34, 44, 61.)  In fact, Skaggs asserts that she had been directed to perform the work of associate employees by her GM on certain occasions.  (*Id.* at 65.)  In other words, Skaggs posits that she was an AM in name only—she spent her time performing the same work as hourly employees and relied on the GM or upper-level managers to provide her with tasks.  (*Id.* at 8, 16, 21, 25–26, 34, 44, 61, 65, 68–69.)

However, Skaggs also testified that she performed many job functions for which hourly employees were not responsible.  For example, Skaggs stated that she conducted the daily morning meeting when her GM was absent during which she reviewed sales information, priorities for the day, and directives or notes from Gabe's corporate office with the other employees in the store.[5]  (*Id.* at 18.)  She also stated that she determined who should perform which tasks during the

---

[4] When asked how she knew that 80 to 90 percent of her time was spent performing non-exempt tasks, Skaggs responded that: "I guess I can't say that it could be 80 to 90 percent.  It was a large amount of my time."  (Doc. 25-3, p. 44.)

[5] Skaggs referred to this meeting as the daily chat-in.  (*Id.* at 18.)

morning in terms of cleaning or restoring the store from the prior day, that she

could reassign associate employees to help in other departments that were

understaffed throughout the day, and that she could determine whether associates

would need to stay later than their scheduled shifts to complete tasks at the end of

the day.  (*Id.* at 19, 24.)  She also noted that she frequently checked in on the

associate employees she oversaw to see how they were doing throughout the day,

and coached these employees on behavior and performance issues both orally and

in writing.  (*Id.* at 38, 41–42.)  If she were the only manager, Skaggs testified that

she would check emails in the main office, and that she reviewed payroll budgeting

mid-week to determine the store's compliance with its labor budget, but that she

was unable to call in additional help without GM or district manager approval.  (*Id.*

at 22, 30.)  In addition, Skaggs testified that when the district director visited her

store, she would walk around the sales floor with him and take notes based on his

comments and observations.  (*Id.* at 32–33.)  Skaggs stated that she handled

customer and employee complaints and customer returns, up to a certain dollar

amount.  (*Id.* at 34.)  She also noted that she attended interviews, identified hiring

needs for her GM, performed some interviews herself, and reviewed associates for

promotions, which were recommended to her GM.  (*Id.* at 35–37, 40.)  Finally,

Skaggs testified that she was salaried and earned $56,000 per year, and that she was eligible for vacation pay and sick leave.[6]  (*Id.* at 54.)

Skaggs stated that she voluntarily left her employment with Gabe's in March 2017 because she was frustrated by her controlling GM, her inability to physically perform the manual labor being asked of her, and the perpetual understaffing at her store.  (*Id.* at 15, 44, 51–53, 60.)

### B. Opt-In Plaintiff 1: William Arnold, IV

Plaintiff William Arnold, IV ("Arnold") worked as a customer experience/support manager from April 17, 2018 until November 2018.  (Doc. 25-4, p. 6.)  During his roughly seven months as an AM, Arnold testified that he worked in at least three different stores, including Gabe's' Madison, Tennessee; Indianapolis, Indiana; and Bowling Green, Kentucky stores.[7]  (*Id.* at 9–10.)  Regardless of which store that he worked in, Arnold testified that he performed largely the same duties, spending roughly 80 percent of his time running the cash register, assisting customers, stocking, unloading freight, cleaning the store, and other associate employee-level tasks.  (*Id.* at 12, 19, 21, 22, 59, 62–63, 65.)  Arnold claimed that his work was often physically taxing and that he considered

---

[6] Skaggs testified that she understood that her salary was meant to compensate her for all hours worked.  (Doc. 25-3, p. 57.)

[7] Of these stores, Arnold testified that, collectively, he worked at the Indianapolis and Bowling Green stores for their grand openings for just over two weeks.  (Doc. 25-4, pp. 9–10.)

himself to be an "expensive cashier," rather than a management level employee. (*Id.* at 21, 29.)  Specifically, Arnold asserted that he worked under a hands-on GM, was never the only manager working in the store,[8] never completed the schedule for his store, never participated in the performance review process, and did not hire, fire, or train employees.  (*Id.* at 17–18, 25, 28, 43.)  He stated that his GM left to-do lists for tasks that needed to be accomplished throughout the store, and that anything outside of these lists required GM approval.  (*Id.* at 23–24.)  Arnold claimed that associate employees were limited to their scheduled hours, and that any additional work required him to step into their positions since Gabe's maintained strict labor budgets.  (*Id.* at 59.)  As a result, he asserts that he consistently worked more than 45 hours per week, but that he did not maintain a log of these hours.  (*Id.* at 60–61.)

Arnold admitted that he likely did not work for Gabe's long enough to understand many of the processes that he would be responsible for as an AM, and attributed some of his lack of responsibilities to this inexperience.  (*Id.* at 25, 34, 37.)  Specifically, he stated that he conducted one interview, and likely would have done more interviewing if he remained with the company longer.  (*Id.* at 34.)  However, he states that he did participate in training associate employees as an

_____

[8] Despite this assertion, Arnold also testified that he was left in charge if the GM was not in the store.  (Doc. 25-4, p. 23.)

everyday occurrence.  (*Id.*)  Arnold claims that he voluntarily resigned his employment with Gabe's due to the "back breaking" work and his discontentment from the workload.  (*Id.* at 20.)

### C. Opt-In Plaintiff 2: Holly Hofmann

Plaintiff Holly Hofmann ("Hofmann") was employed as an AM from February 2017 until March 2020.  (Doc. 25-5, pp. 6, 13.)  Hofmann asserts that as an AM, 75 percent or more of her time was spent performing the same work as hourly associate employees such as unloading trucks, processing freight, moving merchandise onto the sales floor, operating the cash register, stocking shelves, and cleaning the store.  (*Id.* at 22, 84.)  To accomplish these tasks, Hofmann stated that she consistently worked between 50 to 60 hours per week for which she was not paid overtime.[9]  (*Id.* at 76.)

Hofmann testified that she began working for Gabe's at the Pottstown, Pennsylvania store during its grand opening process from February to April 2017, which she claimed involved moving and processing significant amounts of freight and attending hiring events to staff the store.  (*Id.* at 7−8.)  She asserts that she remained at the Pottstown location until September 2017 when she relocated to the Quakertown, Pennsylvania store for its grand opening in October 2017.  (*Id.* at 11.)  Hofmann testified that she also assisted with hiring events for the Quakertown

---

[9] As with Skaggs and Arnold, Hofmann did not keep a log of her hours worked.  (*Id.* at 77.)

store.  (*Id.*)  Hofmann alleges that she worked at the Quakertown store until February 2018 when she left to assist at the Exton, Pennsylvania store's grand opening.  (*Id.* at 12.)  She continued working at the Exton location until September 2019, when she left to work at the Lancaster, Pennsylvania store until March 2020.  (*Id.* at 12–13.)  In between these positions, Hofmann also states that she worked at Gabe's Altoona, Pennsylvania and Montgomeryville, Pennsylvania stores during their grand openings.  (*Id.* at 46.)  Thus, Hofmann appeared to spend most of her time as an AM working at new stores for their grand openings.

Despite claiming to spend a significant amount of time moving and processing freight for store openings, Hofmann also alleges that she ran chat-ins, participated in conference calls with other managers, read weekly directives from upper management which she passed down to intermediate and associate-level employees, assigned employees to different departments based on store needs, and assumed certain GM responsibilities when the Exton location temporarily lacked a GM.  (*Id.* at 29, 32, 34–35, 37–38, 43.)  In addition, Hofmann claimed that she kept track of employees' attendance violations, wrote up at least one employee for disciplinary infractions, and completed the schedule for her store on a few occasions, though she did not consider scheduling to be a typical part of her duties.  (*Id.* at 30, 32, 39.)  Finally, Hofmann testified that she was responsible for putting

in maintenance tickets to have store issues addressed, and performing background checks for newly hired employees.  (*Id.* at 52, 57.)

Finally, it appears that Hofmann was subject to a negative performance review during her time as an AM.  (*See* Doc. 25-8.)  Indeed, in April 2019, it appears that Hofmann scored a 2.2 overall out of a 4-point system, indicating that her work needed improvement.  (*Id.* at 4.)  The comments accompanying this performance review noted that her communication with employees she supervised, her coaching skills, and her prioritization of tasks all needed improvement.  (*Id.* at 3.)

### D. Opt-In Plaintiff 3: Dawn Peters

Plaintiff Dawn Peters ("Peters") was employed as an AM from June 2014 through January 2019 at Gabe's' Martinsburg, West Virginia store.  (Doc. 55-1, p. 2.)  Peters claimed that she worked between 55 and 60 hours per week, but expected that she worked more around the holidays.  (*Id.* at 3.)  She noted that around 90 percent of her day was spent helping customers and completing other hourly work, but she stated that she earned $59,000 per year and was eligible for year-end bonuses, vacation and sick leave, health insurance, and a 401(k) plan.  (*Id.* at 4.)

### E. Opt-In Plaintiff 4: Montwaine Lake

Plaintiff Montwaine Lake ("Lake") worked as an AM in Bear, Delaware from 2017 until 2019.[10]  (Doc. 55-2, p. 2.)  Lake claimed that he worked between 55 and 60 hours per week on average, noting that his store was consistently busy and understaffed, and that he felt he was expected to work extra hours to help associate employees with their work to meet the store's labor budget goals.  (*Id.* at 3–4.)  As a result, Lake alleges that he spent 80 to 90 percent of his time at work performing hourly associate work.  (*Id.* at 4.)  However, Lake recalled that he received an annual bonus, health insurance, vacation and sick days, and a 401(k) plan.  (*Id.* at 3.)[11]

### F. Gabe's Discovery Production

In contrast to Plaintiffs' assertions that they spent the majority of their time at work performing manual labor and non-managerial tasks, Gabe's has produced seven declarations from AMs in various stores which directly contradict Plaintiffs' assertions.  (*See* Doc. 43-2, pp. 54–69, 126–35, 139–44, 149–54, 191–97.)  These

---

[10] Lake noted that he also worked at other stores to help out.  (Doc. 55-2, p. 2.)

[11] The court recognizes that Skaggs filed the declarations of opt-in Plaintiffs Peters and Lake after the close of discovery and briefing on the motion for conditional certification.  (Doc. 55.) The court also notes that Gabe's has objected to these declarations on the grounds that they were filed after the close of discovery and briefing in this case.  (Doc. 59.)  Since the parties have not had an opportunity to fully brief these declarations, but finding that they do not otherwise materially change the outcome of the case, the court affords limited weight and discussion to these declarations, mentioning them where appropriate below.

declarations indicate that the role of an AM involves managerial work with minimal time spent performing associate employees' job duties. (*See id.* at 56−60, 64−68, 128−31, 134−35, 141−44, 151−54, 193−97.)  In many cases, AMs work hand-in-hand with their GMs to ensure that the store functions properly. (*See id.* at 59, 131, 135, 144, 151, 193−96.)  These declarations also indicate that the role of an AM in a given store can vary, and depends on the store's GM and the GM's management style. (*See id.* at 59, 131, 135, 144, 151−52, 192−96.)  While some AMs may perform manual labor, they assert that it is never for an appreciable period of time, is usually incidental to their management duties, and is completed at their sole discretion. (*See id.* at 57, 65, 134, 142, 152, 193.)  Moreover, many AMs use these opportunities to further coach and train their associate employees to minimize the time that AMs spend performing associate-level work in the future. (*See id.*)

Because of the managerial role that AMs play, they are compensated at a higher rate of pay than hourly employees, including eligibility for bonuses, 401(k) retirement plans, vacation time, sick leave, and health care. (*See* Doc. 25-2, pp. 14−15; Doc. 29-5.)

## JURISDICTION AND VENUE

Plaintiffs allege violations of the FLSA. (*See* Doc. 1.)  Pursuant to 28 U.S.C. § 1331, the court has jurisdiction over claims that arise under the laws of

the United States.  Venue is also appropriate because a substantial part of the events giving rise to this litigation occurred within the Middle District of Pennsylvania and because Plaintiff resides in this district.

## STANDARD OF REVIEW

Under the FLSA, employers are obligated to pay employees a minimum of one and a half times their rate of pay for all hours worked in excess of forty hours per week.  *See generally* 29 U.S.C. § 201, *et seq*.  As an enforcement mechanism for employers who do not comply with these responsibilities, the FLSA allows an employee to bring an action "for and in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).

Employees choosing to bring an action on behalf of themselves and others may bring a collective action in which they face two hurdles before such action may proceed under the FLSA.  *See Symczyk v. Genesis Healthcare Corp.*, 656 F.3d 189, 192 (3d Cir. 2011), *rev'd on other grounds*, 133 S. Ct. 1523 (2013).  This two-step procedure is not contained within the FLSA.  However, it has been endorsed by the Third Circuit as the proper approach for collective certification analysis.  *Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527, 536 (3d Cir. 2012) (citing *Symczyk*, 656 F.3d at 193 n.5).

### A. First Step of the Certification Analysis

First, the court must ascertain whether the putative collective is similarly situated to the named plaintiff. *Id.* In other words, "a plaintiff must produce some evidence, 'beyond pure speculation,' of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees." *Id.* at 193 (citing *Smith v. Sovereign Bancorp, Inc.*, No. 03-2420, 2003 U.S. Dist. LEXIS 21010, at *10 (E.D. Pa. Nov. 13, 2003)). Courts in this circuit have described this burden as a "modest factual showing" in which the court exercises its discretion to enable the parties to send notice to potential collective members. *Symczyk*, 656 F.3d at 192–93 (citing *Wright v. Lehigh Valley Hosp.*, No. 10-431, 2010 U.S. Dist. LEXIS 86915, at *7–10 (E.D. Pa. Aug. 24, 2010) (canvassing cases)); *Zavala*, 691 F.3d at 536.

If a plaintiff meets this burden, the court will "conditionally certify" the collective such that pretrial discovery may proceed, and notice may be sent to putative members of the collective, who may then affirmatively opt in to the litigation. *Symczyk*, 656 F.3d at 192.

### B. Intermediate Standard of Review at the First Step of the Certification Analysis

Some district courts within the Third Circuit, including the undersigned, have applied an intermediate standard of review for the first step of this

certification process when the parties have already engaged in some measure of discovery.  *See Kane v. Ollie's Bargain Outlet, Inc.*, No. 1:18-cv-2261, 2020 U.S. Dist. LEXIS 219927, at \*24–32 (M.D. Pa. Nov. 24, 2020) (Wilson, J.); *Sloane v. Gulf Interstate Field Servs.*, No. 4:16-cv-01571, 2017 U.S. Dist. LEXIS 43088, at \*17 (M.D. Pa. Mar. 24, 2017); *Villanueva-Bazaldua v. TruGreen Ltd. Partners*, 479 F. Supp. 2d 411, 415 (D. Del. 2007).  Courts utilizing this standard recognize that:

> applying the intermediate approach helps "the Court [to] make an educated decision as to whether certifying this matter as a collective action would survive the decertification process."  To proceed otherwise "would be an exercise in futility and wasted resources for all parties involved."  "Although the burden for certifying a FLSA lawsuit for collective action notification is light, there are limits, and the district court cannot function as a rubber stamp for any and all claims that come its way under this statute."  "Consistent with this principle, courts have the responsibility to avoid 'stirring up' litigation through unwarranted solicitation."

*Sloane*, 2017 U.S. Dist. LEXIS 43088, at \*17 (citations and footnotes omitted).  Thus, an intermediate standard of review reconciles the parties' advanced discovery positions with the court's typical reliance solely "on the pleadings and affidavits . . . to determine the suitability of conditional certification."  *Waltz v. Aveda Transp. & Energy Servs.*, No. 4:16-cv-00469, 2016 U.S. Dist. LEXIS 178474, at \*5 (M.D. Pa. Dec. 27, 2016) (citing *Villanueva-Bazaldua*, 479 F. Supp. 2d at 415).  In other words, an intermediate standard mandates that "from the

plaintiff to whom much discovery is given, much proof is expected in return."

*Sloane*, 2017 U.S. Dist. LEXIS 43088, at *15.

The Southern District of Illinois has aptly summarized the need for an intermediate approach in light of the procedural challenges facing courts where the parties have engaged in discovery, yet only seek conditional certification. *See Bunyan v. Spectrum Brands, Inc.*, No. 07-cv-0089, 2008 U.S. Dist. LEXIS 59278 (S.D. Ill. Jul. 31, 2008).

> It is clear that the parties have conducted a substantial amount of discovery in this case. They have exchanged interrogatories, conducted depositions, and exchanged a large number of documents. The Court cannot close its eyes to the amount of discovery already performed in this action. At the same time, the Court is cognizant that Plaintiffs only seek conditional certification at this point and that discovery is not complete. Taking the intermediate two-step approach permits the Court to determine whether a sound basis exists for proceeding conditionally as a collective action while also considering all evidence available at this time. Additionally, because discovery is not yet complete, conditional certification, if granted, permits Defendants to make a fully informed challenge to certification once discovery concludes. As such, the Court's analysis proceeds under the intermediate approach.

*Id.* at *4.

Indeed, several district courts outside of this Circuit have found the intermediate approach to conditional certification prudent. *See, e.g.*, *McClean v. Health Sys.*, No. 11-3037, 2011 U.S. Dist. LEXIS 142283, at *10–13 (W.D. Mo. Dec. 12, 2011) (adopting an intermediate standard where some measure of discovery was completed); *Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, No.

3:10-cv-592, 2011 U.S. Dist. LEXIS 105302, at *15–18 (W.D.N.C. Sept. 16, 2011) (noting that while significant discovery had not yet occurred, "the Court cannot ignore the fact that the parties requested, and engaged in, some discovery on the certification issue"); *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 895 (N.D. Iowa 2008) (applying "the more onerous second stage analysis to account for all the important facts learned through discovery that inform what putative plaintiffs, if any, are similarly situated to existing plaintiffs"); *Thiessen v. GE Capital Corp.*, 996 F. Supp. 1071, 1080–81 (D. Kan. 1998) (noting that where the parties had already conducted three months of discovery, the plaintiff was clearly "beyond the 'notice stage,'" and application of an intermediate standard was appropriate).

### C. Second Step of the Certification Analysis

Regardless of which standard is used for the first step of the certification analysis, under the second hurdle, the court "makes a conclusive determination as to whether each plaintiff who has opted in to the collective action is in fact similarly situated to the named plaintiff." *Symczyk*, 656 F.3d at 193 (citing *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008)).  This second stage typically occurs after the parties have engaged in substantial discovery and have assembled "a much thicker record" on which a court may evaluate the relative positions and similarities of the putative collective members.

*Id.* (quoting *Morgan*, 551 F.3d at 1261).  Once the court has the benefit of this added discovery, it may consider, *inter alia*:

> whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment.  Plaintiffs may also be found dissimilar based on the existence of individualized defenses.

*Zavala*, 691 F.3d at 536–37 (citing *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 389 n.17 (3d Cir. 2007); 45C Am. Jur. 2d Job Discrimination § 2184).  The Third Circuit has emphasized that these enumerated factors are not exhaustive, and that the plaintiff must satisfy his or her burden at the second stage by establishing that the plaintiffs who have opted in are similarly situated to the named plaintiff(s) by a preponderance of the evidence.  *Zavala*, 691 F.3d at 537; *Symczyk*, 656 F.3d at 193 n.6.  Thus, plaintiffs face a more demanding burden at the second stage of the collective certification analysis.  *Zavala*, 691 F.3d at 534.

### D. Modest Factual Showing Versus Intermediate Approach

In this case, the parties do not purport to disagree regarding which standard is applicable at the first step—the modest factual showing or the intermediate approach.  However, the parties do disagree regarding the weight and level of consideration that should be afforded to the opposing party's evidence.

Skaggs argues that the court should apply the modest factual showing standard since she only seeks conditional collective certification, the consequences

of which merely involve sending notice to potential collective members.  (Doc. 25, pp. 17–18.)  Skaggs asserts that she has satisfied her modest factual burden because she has produced evidence that Gabe's classifies all AMs as exempt from the overtime provisions of the FLSA regardless of any distinguishing characteristics they may have.  (*Id.* at 20–23.)  In addition, Skaggs alleges that she has produced evidence that Gabe's maintains a policy or practice of deliberately underfunding its stores' labor budgets to force FLSA-exempt AMs to perform hourly associate employee work, thereby reducing labor costs.  (*Id.*)  Plaintiffs have testified and declared that their job duties involved performing the work of non-exempt hourly employees, that they consistently worked in excess of 40 hours per week, and that they were not paid overtime for any of these hours worked in excess of 40 hours per week.  (Doc. 45, pp. 3–4.)  In addition, they have testified and declared that their stores were consistently understaffed, and that they frequently needed to fill in the gaps in associate employees' work.  (*Id.*; *see* Doc. 25-3; Doc. 25-4; Doc. 25-5.)  Skaggs urges the court to disregard Gabe's' seven declarations submitted in opposition to the motion, reiterating that she has only moved for conditional certification, and that evidence outside of the complaint and accompanying affidavits should not be considered in light of the preliminary procedural posture of the case.  (*Id.* at 23.)

For its part, Gabe's asserts that the court should consider the extensive discovery that the parties have completed, which proves that Skaggs cannot meet even the modest factual showing necessary to demonstrate that she is entitled to conditional certification.  (Doc. 43, pp. 22–24.)  Gabe's argues that Skaggs has not established that she is part of a similarly situated collective for purposes of collective management.  (*Id.* at 24–26.)  Specifically, Gabe's posits that the court would be required to conduct an individualized inquiry into the job duties that each Plaintiff performed since Skaggs relies on common job descriptions as support for conditional certification, yet presents declarations and testimony demonstrating that the job duties each Plaintiff actually performed deviated from this description to varying degrees.  (*Id.* at 26–39.)  Gabe's further claims that its own seven declarations, combined with the evidence that all Plaintiffs testified to performing different job duties, demonstrate that AMs perform different job duties depending on their store needs, GM, and individual initiative.  (*Id.* at 26–44.)  Thus, according to Gabe's, Skaggs' reliance on blanket classification for purposes of collective certification and administration is inappropriate and would result in an unmanageable collective.  (*Id.*)

The court notes that both parties have strong arguments in support of their positions.  However, the court independently finds that the intermediate standard is appropriate here to best serve the interests of judicial economy and achieve an

efficient resolution of this case.  As the *Sloane* court quipped, "from the plaintiff to whom much discovery is given, much proof is expected in return."  2017 U.S. Dist. LEXIS 43088, at *15.  The parties have voluntarily engaged in discovery in this case involving significant document production, depositions of three Plaintiffs, exchange of interrogatories, a Rule 30(b)(6) deposition, and declarations being submitted from Plaintiffs and seven AMs employed by Gabe's across its various locations.  The parties chose to engage in this discovery as requested in their joint case management plan.  (*See* Doc. 15.)  The parties have attached the resulting voluminous discovery record to their briefing for the motion for conditional certification.  (*See* Docs. 25, 29, 33, 40, 43, 55.)  "The [c]ourt cannot close its eyes to the amount of discovery already performed in this action."  *Bunyan*, 2008 U.S. Dist. LEXIS 59278, at *4.  Indeed, "it would be an entirely inefficient use of resources for [the court] to conditionally certify a collective action, only to double-back because the bulk of the discovery it already considered has cast an ominous shadow upon the propriety of the ultimate merits."  *Sloane*, 2017 U.S. Dist. LEXIS 43088, at *22.  Thus, the court finds it appropriate to consider the discovery submitted in this case, despite its preliminary procedural posture.

Despite this conclusion, the court also notes that the Third Circuit has not had the opportunity to consider whether this Circuit should apply the intermediate standard in cases such as this where some measure of discovery has already

occurred.  Thus, out of an abundance of caution, the court will also review the conditional certification question under the modest factual showing standard.

DISCUSSION

## A. Skaggs is Not Entitled to Conditional Certification Under the Intermediate Standard.

In considering discovery under the intermediate standard, with an eye toward determining whether the plaintiffs are similarly situated, courts have found it appropriate to divide their analysis into three parts: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant; and (3) fairness and procedural considerations."  *Sloane*, 2017 U.S. Dist. LEXIS 43088, at *27–28 (quoting *Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, No. 10-948, 2011 WL 6372852, at *3 (W.D. Pa. Dec. 20, 2011)). First, the court considers the "plaintiffs' job duties, geographical location, supervision, and salary."  *Id.* at *28 (quoting *Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372, 378 (W.D. Pa. 2011)).  Second, the court considers whether defenses raised by the defendant would apply to the collective as a whole or with respect to individual opt in plaintiffs.  *Id.* (quoting *Andrako*, 788 F. Supp. 2d at 378).  Finally, the court considers questions of fairness, efficiency, and procedural considerations—whether the collective would require an individual inquiry into each plaintiff, rather than an examination of the collective's employment situation.

24

*Id.* (quoting *Lusardi v. Xerox Corp.*, No. 83-809, 118 F.R.D. 351, 360 (D.N.J. Nov. 5, 1987)).

As part of the court's responsibility in conducting this analysis, the court must consider section 216(b)'s primary objectives: (1) lowering costs for plaintiffs by pooling resources; and (2) limiting controversies to one proceeding which can efficiently resolve "common issues of law and fact that arose from the same alleged activity." *Id.* at *28–29 (quoting *Moss v. Crawford & Co.*, No. 98-1350, 201 F.R.D. 398, 410 (W.D. Pa. Sept. 21, 2000)).  Part of this consideration is whether the court can "coherently manage the class in a manner that will not prejudice any party." *Id.* at *29 (quoting *Moss*, 201 F.R.D. at 410).

Turning to the first factor, the disparate factual and employment settings of the individual Plaintiffs, the court finds that there are disparities between Gabe's job descriptions and the work Plaintiffs assert that they completed.  The record demonstrates that Gabe's maintains uniform job descriptions for its AMs, which, if uniformly followed, would result in all AMs being classified as exempt.  (Doc. 25-6, pp. 2–3; Doc. 25-7, pp. 2–3.)  However, Plaintiffs present a conflicting account of their job duties which, in some instances, bear little resemblance to Gabe's official AM job descriptions.  Further, the record assembled from a fraction of the potential collective members in this case indicates that the responsibilities of AMs can vary drastically.

For example, Arnold testified that he viewed his role in the company as that of an "expensive cashier," and largely took direction from his GM, rather than proactively performing the duties of an AM as laid out in Gabe's job description. (Doc. 25-4, p. 29.)  Moreover, Arnold believed that he did not remain with the company long enough to fully understand or assume responsibility for all of the AM job duties.  (*Id.* at 6, 25, 30, 34, 37.)  In stark contrast, AM Brandon Lee ("Lee") declared that he routinely made decisions about who to hire and fire, assigned tasks for associate employees, prioritized tasks for the day, oversaw the orientation and training process for new associates, made recommendations on employees' compensation, conducted associate performance reviews, read sales reports and made decisions based on them, and handled customer and employee issues and complaints when they arose.  (Doc. 43-2, pp. 57–60.)  Lee stated that he performed his job with little oversight, but generally worked collaboratively with his GM when the GM was in the store.  (*Id.* at 59.)

The notion that AMs' duties can vary is supported by the record from both Plaintiffs' and Gabe's declarations and depositions.  While some AMs testified that their role is largely the same as the GM and that they work hand-in-hand with their GM, other AMs viewed their role as subservient to that of their GM and merely performed tasks assigned to them.  (*Compare* Doc. 43-2, pp. 55, 58–59, 63, 66–67, 127, 131, 135, 144, 151, 193–96; Doc. 25-5, p. 38, *with* Doc. 25-3, pp. 8,

16, 51, 53, 64–65, 68, 69; Doc. 25-4, pp. 18, 29; Doc. 25-5, p. 82.)  These

declarations also indicate that the role of an AM can vary depending on the store's

GM and the GM's management style.  (*See id.*)

In addition, the record reflects a disparity in the amount of manual labor that

AMs perform.  Specifically, while some AMs assert that they are not required to

perform associate employee-level work for an appreciable period of time or that

these duties are incidental to their management duties, others testify that almost

their entire day is spent performing hourly associate-level work.  (*Compare* Doc.

43-2, pp. 57, 65, 134, 142, 152, 193, *with* Doc. 25-3, pp. 44, 52, 61; Doc. 25-4,

pp. 20–21, 62–63; Doc. 25-5, p. 84; Doc. 55-1, p. 4; Doc. 55-2, p. 4.)  Further,

some AMs attribute their need to perform hourly associate work to chronic

understaffing at their store, while others assert that they were required to perform

these duties as assigned by their GM.  (*Compare* Doc. 25-3, pp. 15, 25, 44, 53,

60–61; Doc. 25-4, pp. 21, 64; Doc. 25-5, p. 22, *with* Doc. 25-3, p. 65; Doc. 25-5,

p. 82.)

The court finds that the sole similarity among all AMs on the record is their

compensation package.  It is undisputed that AMs are compensated at a higher rate

of pay than hourly employees, including eligibility for annual bonuses, sick leave

and vacation time, health care, and 401(k) retirement plans.  (*See* Doc. 25-2,

pp. 14–15; Doc. 29-5.)  Thus, the first factor weighs against conditional certification due to the disparity in AMs' job duties.

The second factor, the various defenses available to the defendant, likewise cuts against conditional certification in this case.  Gabe's has primarily asserted that its AMs are exempt for purposes of the overtime provisions of the FLSA because AMs fall within the FLSA's executive exemption.[12]  (Doc. 25-2, p. 42.) As many courts have recognized, determining the applicability of exemptions under the FLSA involves a fact-specific inquiry, often ill-suited to resolution in the context of a collective action.  *See, e.g.*, *Espinoza v. Atlas R.R. Constr., LLC*, 657 F. App'x 101, 108 n.3 (3d Cir. 2016) (citing *Carey v. Nat'l Event Servs., Inc.*, No. 14-cv-5006, 2015 WL 667519, at *5 (E.D. Pa. Feb. 13, 2015) (noting that determining an employee's duties for purposes of FLSA exemption applicability is a fact-specific inquiry)); *Aquilino v. Home Depot, U.S.A., Inc.*, No. 04-04100, 2011 U.S. Dist. LEXIS 15759, at *26–27 (D.N.J. Feb. 15, 2011) (noting that whether a plaintiff "satisfies the executive exemption criteria is 'an individual, fact-specific analysis'") (quoting *Morisky v. Public Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000)); *Gallagher v. Lackawanna Cty.*, No. 3:07-cv-912, 2008 U.S.

---

[12] The executive exemption is applicable to employees who: (1) earn a certain minimum salary; (2) have as their primary duty the management of the employer; (3) customarily and regularly direct the work of two or more employees; and (4) have the authority to hire or fire employees or have the ability to suggest or recommend hiring, firing, advancement, or promotion of employees, whose suggestion or recommendation is given particular weight. 29 C.F.R. § 541.100(a).

Dist. LEXIS 43722, at *28 n.8 (M.D. Pa. May 30, 2008) (collecting cases) (noting that "[c]ourts denying conditional certification have done so where the FLSA claims involve fact-specific inquiries into the duties of an employee to determine whether the employee was properly classified as exempt from the overtime requirement or as an independent contractor").

The record in this case indicates that AMs had varying levels of responsibility at different stores and that not all AMs performed the same job duties. While some AMs assert that they were responsible for managing other employees; making recommendations for hiring, firing, or promoting employees; exercising independent judgment; or performing non-manual labor, others allege that they did not perform any of these tasks on a routine basis, or perhaps at all. (*Compare* Doc. 43-2, pp. 56–60, 64–68, 128–31, 134–35, 141–44, 151–54, 193–97, *with* Docs. 25-3, 25-4, 25-5, 55-1, 55-2.) Based on this record, the court finds that the fact-specific nature of these inquiries, i.e., whether one or more exemptions under the FLSA apply to Plaintiffs, weighs against conditional certification in this case. Thus, the court finds that individualized inquiries would be required as to the applicability of FLSA exemption provisions to each Plaintiff in this case. For instance, the court may find that some AMs were properly classified as exempt, but that others were not based on their alleged duties and responsibilities. This potential difference in outcome for Gabe's defenses is not

conducive to collective management and indicates that denial of collective certification would be appropriate.

Finally, the court turns to questions of fairness, efficiency, and procedural issues.  The court finds that, in light of the significant differences among the job duties of the AMs on the record before the court, which is made up of declarations and testimony from only a fraction of Skaggs' proposed collective, Skaggs' proposed collective is simply too broad to be similarly situated for purposes of collective management.  Skaggs seek to conditionally certify a collective of <u>all</u> current and former AMs employed by Gabe's across all of its stores from November 26, 2016 to present day.  (Doc. 24, p. 1.)  Thus, based on Skaggs' defined collective, the court must potentially consider the duties performed by over 300 AMs across 110 stores in 13 states to determine whether one or more FLSA exemptions are applicable.  (Doc. 43, pp. 9, 46.)  Skaggs' proposed collective places the court in a position where it could find that one or more FLSA exemptions are applicable to some Plaintiffs, but not the entire collective.  In sum, there is no efficiency to conditionally certifying this collective action and the court cannot coherently manage the collective in a manner that will not prejudice any party.

Considering all of the foregoing factors, the court finds that none weigh in favor of granting conditional certification and that Skaggs' proposed class is too

broad to make collective management possible.  Therefore, applying the

intermediate standard of review, the court will deny Skaggs' motion for

conditional certification.  (Doc. 24.)

### B. Skaggs is Not Entitled to Conditional Certification Under the Modest Factual Showing Standard.

Even if the intermediate standard were not applied, however, Skaggs has

failed to satisfy her burden under the modest factual showing standard.  Skaggs

must "produce some evidence, 'beyond pure speculation,' of a factual nexus

between the manner in which the employer's alleged policy affected her and the

manner in which it affected other employees."  *Symczyk*, 656 F.3d at 193 (citing

*Smith*, 2003 U.S. Dist. LEXIS 21010, at *10).  Skaggs has shown that Gabe's

maintains a policy of classifying all AMs as exempt from FLSA overtime

provisions regardless of the AM's state, district, region, size of store, number of

employees, sales volume, experience, training, or GM.  (Doc. 25-2, pp. 11, 13,

41–42.)  Skaggs has also shown that she is subject to this policy as an AM

employed by Gabe's.  However, Skaggs has failed to show that her

misclassification challenges to Gabe's policies are more broadly applicable to AMs

other than herself.

Initially, the court finds that there are meaningful differences in each

Plaintiff's testimony that would require the court to conduct individualized

inquiries to determine whether the FLSA exemption provisions would apply.  For

example, Skaggs testified that she performed certain job functions for which hourly associate employees were not responsible, including conducting daily chat-ins and checking emails when her GM was absent; reviewing sales information, priorities for the day, and directives or notes from Gabe's corporate office with the other employees in the store; delegating tasks for associate employees; checking in with these employees throughout the day on their processes, progress, and performance; coaching associates on behavior and performance issues both orally and in writing; reviewing payroll budgeting; walking the sales floor with the district director and taking notes; handling customer and employee complaints; attending interviews, identifying hiring needs for her GM, and performing some interviews herself; reviewing associates for promotions; and preparing a draft of her store's schedule.  (*Id.* at 18–19, 22, 24, 30, 32–37, 38, 40–42.)

In contrast, Arnold testified that he felt like an "expensive cashier," since he had no authority to hire, fire, or onboard new employees, was confined to performing the tasks enumerated on a list from his GM when his GM was absent, and did not conduct performance reviews, generate the schedule for his store, or otherwise exercise independent judgment with respect to his duties.  (Doc. 25-4, pp. 17, 23–25, 28–29, 37, 43, 63.)

Presenting yet another version of AM duties is Hofmann, who testified that her stores were understaffed, causing her to spend over 75 percent of her day

performing the same work as hourly associate-level employees.  (Doc. 25-5, pp. 22, 84.)  However, Hofmann also occasionally drafted the schedule for her store, read and communicated weekly directives from corporate, kept track of attendance violations, ran daily chat-ins, reassigned and delegated employees to different tasks, sat in on some conference calls, and participated in the interviewing and hiring process for new associates.  (Doc. 65-32, pp. 8, 11, 29–30, 32, 34–35, 37–38, 39, 43, 52.)  Thus, the court has been presented with Plaintiffs who have varying levels of responsibility across different stores with different GMs and different staffing needs.

More fundamentally, the court finds that Arnold and Hofmann are poor representatives for the putative collective and that they are not similarly situated to Skaggs.  Specifically, Arnold only worked as an AM for some seven months, and even admitted that this short period of time was likely the reason that he was not tasked with certain AM responsibilities.  (*See* Doc. 25-4, pp. 6, 25, 34, 37.)  The court finds that Arnold cannot be similarly situated to Skaggs based solely on the length of his employment and limited experience as an AM.  In addition, Hofmann appeared to spend most of her time as an AM working to open new Gabe's stores, which she recognized involved mostly moving freight to physically set up and stock the stores, participating in hiring events to get the stores staffed, and generally getting the new stores up and running, rather than strictly performing

AM duties as enumerated in Gabe's job descriptions.  (Doc. 25-5, pp. 6–13.)
There is also evidence that Hofmann needed improvement in her job function as an
AM, receiving a 2.2 out of 4 on a 2019 performance review for, *inter alia*, failing
to communicate properly with associate staff.  (Doc. 25-8, pp. 3–4.)  Thus, the
court finds that Hofmann is likewise not similarly situated to Skaggs for purposes
of collective certification.

These differences between Plaintiffs are underscored when considering
Gabe's job descriptions for AMs and Gabe's declarations from AMs who could
potentially opt into this litigation.  Gabe's job descriptions and its AM declarations
indicate that—both by design and as a practical matter—AMs spend the majority
of their time managing the store and performing exempt tasks, including leading a
team and supporting the general manager; ensuring that team members understand
how to place products; participating in store walk throughs with the GM "to
identify strengths and opportunities;" assigning and delegating responsibilities for
tasks and decisions; setting clear objectives and measures for team members;
monitoring team members' process, progress, and results; providing feedback on
team members' work; communicating hiring needs to the GM; hiring, training, and
leading retention of new hires; assessing "training and growth opportunities in
departments and creat[ing] a development plan for team" members; conducting
performance reviews; addressing "poor performance or policy violations . . .

including coaching and counseling up to termination." (Doc. 25-6, p. 2; Doc. 25-7, p. 2.) When considered in this light, Skaggs and Plaintiffs' declarations and testimony read more like challenges to their individual treatment or staffing situations, rather than a challenge to Gabe's overarching classification of its AMs. Challenges such as these have already been considered and rejected by other courts. *See Bramble v. Wal-Mart Stores, Inc.*, No. 09-4932, 2011 U.S. Dist. LEXIS 39457, at *27–28 (E.D. Pa. Apr. 11, 2011); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 221 (D. Conn. 2003).

In addition, where, as here, the collective is based on the alleged misclassification of employees under the FLSA, individualized factual determinations are almost always present to ascertain whether an exemption is applicable to a given employee. With just the five Plaintiffs presently involved in this litigation, the court would need to conduct an examination of each Plaintiff's duties and responsibilities to determine whether they would be exempt from the FLSA's overtime provisions. This obligation would be greatly expanded in the event that additional plaintiffs opted into this litigation, especially given that Skaggs anticipates a collective of over 300 AMs.

Many courts have denied conditional certification under similar circumstances where the putative collective would involve individualized inquiries regarding the plaintiffs' FLSA exemption eligibility. *See, e.g.*, *Kane*, 2020 U.S.

Dist. LEXIS 219927, at *24–32 (Wilson, J.) (denying conditional certification under the modest factual showing standard where plaintiffs relied on a common job description but presented testimony that deviated from this description and required individualized inquiries regarding FLSA exemption eligibility); *Harriel v. Wal-Mart Stores, Inc.*, No. 11-2510, 2012 U.S. Dist. LEXIS 97527, at *16 (D.N.J. July 13, 2012) (noting that the court was not required to infer that other employees would have also deviated from the written job description to spend most of their time performing non-managerial tasks and denying conditional certification under the modest factual showing standard); *Bramble*, 2011 U.S. Dist. LEXIS 39457, at *27–28 (denying conditional certification under modest factual showing standard where plaintiffs shared the same job title and job description, but where the court would need to conduct individualized inquiries regarding FLSA exemption applicability); *Aquilino*, 2011 U.S. Dist. LEXIS 15759, at *22 (noting that "employees with the same job title are not 'similarly situated' for the purposes of an 'opt-in' FLSA class if their day-to-day job duties vary substantially" when considering a motion for decertification) (quoting *King v. West Corp.*, No. 8:04-cv-318, 2006 U.S. Dist. LEXIS 3926, at *43 (D. Neb. Jan. 13, 2006)); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1270–72 (M.D. Ala. 2004) (applying a "rudimentary showing" standard and finding that the similarly situated inquiry "must be analyzed in terms of the nature of the job duties performed by each putative

36

plaintiff, because the ultimate issue to be determined is whether each employee was properly classified as exempt"); *Mike*, 274 F. Supp. 2d at 221 (applying a modest factual showing standard and holding that a plaintiff claiming that he was misclassified as exempt was essentially challenging his individual treatment, rather than his employer's classification policy).

Thus, the court finds that denial of conditional certification is appropriate in this case in light of the significant differences in job duties presented by the relatively small sample of the potential collective members under current consideration. The court would need to conduct individualized inquiries into each Plaintiff's job duties—a task ill-suited for collective resolution. Therefore, on these additional grounds, the court will deny Skaggs' motion for conditional certification. (Doc. 24.)

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for conditional certification will be denied. (Doc. 24.) An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: January 26, 2020